May it please the Court of Counsel, Warren County Assistant Prosecutor Kelly Schelling on behalf of the appellants, the New Jersey Attorney General and the Administrator of the East Jersey State Prison, I'd like to reserve two minutes for rebuttal if I may. The appellants have appealed the District's Court's decision granting the petitioner the status of the case. This is one of the craziest cases I think I've ever seen and I don't know how between you and Mr. McCarthy we can figure something out here but I think you would agree, maybe you wouldn't agree, I guess depending on how contentious you want to be, that the State of New Jersey is, I don't think that's the issue. But the issue in this case is how can you justify freezing individual assets, forget about whether they have to be reserved and all that stuff, just focusing on the Chancellor Court's order, how can you justify, maybe you can show me something in the statute I missed under the Fairness Act, freezing individual assets. You're talking about, can I just clarify with the Court, you're talking about assets that would solely belong to Mr. Rambo? Correct. Those assets aren't at issue here, Your Honor, so I don't think we need to... No, but that wasn't the question. How can you justify freezing them? Well, I think they could be frozen under the case law like inmate process. Individually owned assets. If you're talking about something he solely owned, I could agree with the Court that those assets can be frozen. But isn't the question not so much solely owned but whether they're tainted or untainted, that is, are they connected to the crime? And here, they're clearly untainted, aren't they? I disagree with the characterization of the assets as either tainted or untainted. But isn't that the rubric we go by under Kaplan and Monsanto? But that's the state's position, Your Honor, is that this issue has never been addressed by the United States Supreme Court. It's marital assets in a case where one spouse intentionally killed another spouse. How did that issue get to the U.S. Supreme Court? Well, he petitioned for cert. They could have taken that case. Why would they? It's clearly an issue of state law. Why would the Supreme Court have taken an issue like that? Why would they have taken it? It's an issue of marital property. It determined whether the assets in this case, marital assets jointly owned by a married couple, qualify as untainted assets, as that term was defined in Lewis. Lewis talked about assets... Lewis came out several years later. Lewis came out several years later, but it is the Supreme Court case that decided untainted assets. Therefore, the state's position is that case, which was decided in 2016, cannot be the basis for granting habeas relief on a case that became final in 2008. Didn't you just agree with Judge McKee that individual assets can't be frozen? I did. I should clarify. I didn't. I think the Chancery Court could have frozen it, and he could have allowed it yesterday. That's a simple yes or no. Didn't you just agree with Judge McKee to that concept? Yes, I did. The next step, there was some $290,000 that was his money, right? It wasn't his money. That was joint assets. It was marital assets that they later gave him as part of equitable distribution. I disagree. They were never solely his. They were joint assets of the couple. At some point, they gave it to him. They did an equitable distribution hearing, I believe the year was 2010, where they separated the marital assets. They never held they were solely his assets. They separated the marital property. So what was the test in 08? The test in 08 is that there was no U.S. Supreme Court decision. What would the test be here? I mean, there's something that applies, right? There's two Supreme Court decisions from 89, right? Kaplan and Montessanto do not apply because they only addressed tainted assets. The question was, then, what does apply? The state said there is no Supreme Court while it applied. You're in court, then. What is the test that you would have the court apply to have a civil court restrain assets so somebody cannot use them to get counsel of his choice? What is the test that you would apply in 08? State law, Your Honor. And what would the test be under state law? The test would be there is allowed under state law in recross is the ability to put a constructive trust on everything. And the person brings up a federal constitutional claim. And what would you suggest if you were opposing that as the test the court should apply? Well, he cited U.S. v. Gonzales-Lopez, and the appellate division, when it reviewed the estate matter, said Gonzales-Lopez did not apply because the order issue of Gonzales-Lopez occurred in the criminal prosecution. I think we need to get back to that. This is a habeas petition, but the district court is looking at orders from the chancery court. They're not orders that occurred in criminal prosecution. It's sort of like going through the back door what you can't do through the front door. In other words, you're restraining in assets, $290,000 worth of assets that ultimately were determined to be his. He had a right to them. No, I don't think they were ultimately determined to be his. They were ultimately determined to be his share of the equitable distribution of marital assets. That does not exist. Wait a minute. After they're separated. So who did the $290,000 ultimately go to, the little sisters of the poor or what? That money ultimately went to the son because a wrongful death judgment existed at that time for $6 million. Was it his? If they took the money to satisfy the judgment against him. It was separated out from the equitable distribution. But it's not like the money in Lewis, which was a bank account, which was solely Lewis' bank account. We're just trying to get a yes and no. We're trying to take the baby steps here. I know, but this case is more complicated than that. Well, that's why I like to try to unpack it because it's incredibly complicated and it's circular. That's what I think we're all trying to do is just unpack this and break it down to some basics and keep kind of learning it back on us. But even the district court noted in its opinion, I believe it was a footnote in its opinion, that this petitioner never sought the release of any individual assets. He never requested that from the chancellor. That's a different issue. Are you arguing the wage issue? The what? Are you arguing the wage issue? No, no. What I'm saying is the district court said, I can only address the marital assets because that's all he ever asked to be released. What? And we have no idea what sole assets, if any, existed. One thing that confuses the heck out of me is the district court in the habeas case talked about the AEDPA standard, said the AEDPA standard didn't apply because the state court didn't address it on the merits, but then applied the AEDPA standard that the court said didn't apply. But I guess it depends, and this is where the case gets complicated. It gets complicated way before that. Right? Which order you're talking about. And that's part of the problem here, Your Honor. What are we talking about? There's chancery court orders, the criminal court orders. I'm just talking about the district court's order. But the district court's order. I'm not even sure which orders he's talking about sometimes. The habeas order. You brought us here. I know the district court's talking about the habeas orders, but which state court orders he's talking about sometimes. Well, can you show me any state court on appeal that decided the issue on the merits, the 6th Amendment issue? Yes, the state court did. Which one? What's the site to it? Can I grab my binder? Sure. It would be Estate of Rambo. It's an unpublished decision, Your Honor. 2013 Westlaw 512116. And it says, in the opinion, which means it was relying on the trial court's opinion under New Jersey law. I have a 2012 Westlaw opinion. Give me the site of the one you're referring to again. I'm sorry. 2013 Westlaw 512116. Okay. At the end of that opinion, they say, we also conclude that defendants' remaining arguments are without sufficient merit to warrant a discussion in a written opinion. That's a discussion on the merits? So, yes, because they're relying on the decision of the trial court, which they're allowed to do, Your Honor. They can say, we agree with what the trial court said. Did the trial court discuss the 6th Amendment issue or not? The trial court did discuss the 6th Amendment issue. In the New Jersey court or the state trial court? In which opinion? Which opinion? I'm sorry. I can't remember his opinion. I believe it was a transcript from the proceedings on the motion to release the assets. If you want, I can look in the binder and tell you what exactly we're talking about. I can't imagine that even being raised in the chancellery court. What? I can't imagine that even being raised in the chancellery court. He did raise the issue. At one point, an attorney came in to represent Mr. Rambo in the chancellery court. He filed to release the assets. It was raised there. Okay. That was appealed. He asked for, he, Rambo, asked for a 4% or 5% appeal. That was tonight. He didn't get it. Is this the same case we're talking about? He was not given a transcript. And, therefore, No, there is a transcript of that proceeding. If you just give me a moment. The same case was dismissed because he didn't have the money he said to get the transcript. That was in 2005. That was in 2005. But when he appealed the final order of the chancellery court, there were transcripts. Okay. Of this proceeding. Would Your Honor like me to look to find that in the appendix, please? Yeah. If you could find the final order. It's a decision on the record. New Jersey doesn't always provide written opinions. Their judges provide decisions on the record. If Your Honor just gives me a moment. And this is what you're about to give us is the language that the appellate court relied on saying it doesn't merit any further discussion. It doesn't. They read the decision from the trial court, so they don't think anything more is warranted. And that decision was right. They say it just doesn't warrant a written opinion. Okay. You're going to give us that. You're going to give us that. I'm sorry? If you can just give us that discussion. From the trial court. Okay. If Your Honor gives me a moment, I have to find that. Court, if you can't find it quickly, maybe you can put it on the bottle. The last record may be doses. We don't know. We don't jump on the light anyhow. Yeah, I'm not sure how the time works. I've never been here before, Your Honor, so I'll be quick. The citation to the record, that would be JA2876 to JA2877. Hold on, JA276? Yes, 2876 to 2877. Okay. And whether you rightfully or wrongfully agree with what the trial court decided in that case, he did address it. He said he has an attorney I don't think was, you know, applies. Is that all right? Is that a discussion? Yes, and there might be more to that. I'm just giving you a quick summary. Yeah. But, Your Honor, if the state wants to go back to the issue of precedent, you've talked about Kaplan and Montesanto and Lewis, and there's a common thread in all those cases. And the common thread in those cases is that the prosecutor sought the forfeiture. That common thread doesn't exist in this case and actually is materially distinguishable. And as a result, there was no U.S. Supreme Court precedent that existed when this conviction became final. But aren't the consequences down the road that, okay, the prosecutor can't do this? So the prosecutor, for example, in AG's office says, okay, we won't do it. We'll have the civil side of the AG's office go ahead and do it. But that didn't occur here, Your Honor. No, I'm just talking about the next case. And so if we follow your – in light of Lewis, let's go to the next case and not this case. Can the civil side of the AG's office go and get an order from a chancery division, freezing assets, and have that be constitutional? I'm not talking about this case. Can I ask a question? Were they directed to do so because of the criminal prosecution? Yeah, they had a discussion. Okay. If it comes out of the criminal prosecution, I would agree with you. Their nexus exists there. But that nexus doesn't exist here. Well, no, the person who's getting the order is saying, look, these are marital assets. We're not saying that these are necessarily part of the criminal prosecution. The person killed his wife, et cetera, or we're claiming that he is, did. But we'd like you to freeze the assets and go ahead and see what you can do. But there's no standing for this. There would be no standing under New Jersey law for them to do that. And you have to worry about standing as an issue. Not anyone can walk in and do that. And they wouldn't have the ability to do that. So I would say that case is a little less – So how did this case develop in 08, then? Because this is a case developed under the New Jersey Slayer Statute, a case law, about the state and the victims, the beneficiaries of the estate. That's totally separate. The AG's office couldn't say there's two – So the AG's office says to the Civil Division, why don't you talk with the people who are the possible heirs and see if they'll file something under the Slayer Statute in New Jersey. And the person goes and asks them to do that. They do it. And so it's, in effect, coordinated. Is there a violation? I think you're assuming that the AG's office would do something inappropriate. And I just won't make that assumption because we don't get involved in those decisions. I'm not saying it's inappropriate. I'm just saying is it – does, under that circumstance, the Supreme Court's decision at least cover it? So nobody's making an accusation. I guess I'm just – they're saying, you know what? They have a right under the Slayer Statute. Why don't you talk to them and see if they're willing to go forward and do something to try to hold up those assets. They do. And the people file, and the court buys it, just like here. Is that – under Luis, is that a constitutional violation? I think it would depend on the nexus between the prosecution's actions. And I can't say that just telling them they have rights under civil law, I don't think would be enough. Okay. Yes. And I know you're not going to willingly grant me this initial step in this, but work out of your way. If AEDPA doesn't apply. I'm sorry? If AEDPA doesn't apply, don't we then have a situation where the district court was right in saying that the right to counsel was denied? No, I don't think so because there was still no U.S. Supreme Court precedent saying – Wait, wait, wait. That was going to be the problem. You're getting into no Supreme Court precedent. That's AEDPA. I started – I think everybody else has heard that. Okay. I started the question by saying if AEDPA doesn't apply. Repeat after me. If AEDPA doesn't apply. Okay. I understand the question. My response to that would be there's a procedural default by the petitioner then in this case. Why? Because of the agreement. If AEDPA doesn't apply, then who cares about procedural default? I think AEDPA does apply and there is a procedural default. Wait a minute. Let's go back. If AEDPA doesn't apply. But how can you say that? Because there are certain things – Because she's asking you a question. It's called a hypothetical. I understand. What we're trying to do is figure out, I mean, down the road, how does this play out in other cases beyond this? So if AEDPA doesn't apply. Okay. Which means you won't have procedural default. What's your answer? I'm sorry. My answer to how this plays out? My answer would still be that there was no constitutional right violated here because it didn't require a criminal prosecution. Do you agree with the fact that there's a six-amendment right to counsel of your choice if you can afford it? Do you agree with that proposition? Yes. Progress. Okay. Let's go back to that $290,000. Hypothetically, that $290,000 was his. He went home. Don't do that. Assuming he had access to that money, he could have used that counsel of his choice, right? Are you saying it was solely his in a separate bank account? Not a separate bank account. Solely his, just like the court said it was solely his. Then he could use it to defend himself. If it wasn't part of marital assets, yes. If it was solely his property, yes, I would agree to. But marital assets are not his and yours. They're theirs. It is different. They're inexplicably intertwined. And until they're separated, you can't go there. At some point, this was separated and it was used to pay off part of this debt, right? In 2010. Not after his conviction became final. So do you agree with the proposition that a court could deny somebody a constitutional right? I don't think a court could. Mr. Coffin cited a couple of cases where courts were found to have violated individuals' constitutional rights. In those cases, they did it in the criminal prosecution. I would say in a criminal prosecution, a court can violate someone's six-millimeter rights. The issue here is the orders at issue still differ. Can a court violate somebody's constitutional rights in a civil proceeding? Not as applied to a criminal prosecution. That's not the question. Can they violate somebody's constitutional rights in a civil context? I would have to know which rights we're talking about. Some rights are fundamental. Some rights are limited. Any constitutional right? Is it possible for a court to violate somebody's constitutional rights in a civil context? The answer has to be yes. It happens all the time. It's a due process. But the problem here is six-millimeter talks about a criminal prosecution. That's what the text of the six-millimeter says. There was no court order in the criminal prosecution that violated this petitioner's rights. None. The prosecution never sought to freeze his assets. We weren't a party to the case in the Chancery Court. And the criminal judge never, ever entered any order that interfered with his rights. He was clean to Trump about what was going on? He expressed a personal opinion, but he also said, I do not have the power to do anything about it. Was he right about that? Yes, he was right about that. He could have stayed his trial. Actually, in the real world, what happens is he gets on the phone, calls the Chancery judge, and says, look, we've got a problem here. Can you go ahead and move the case? And I'm going to hold mine until you do. Or he sends another. I think you're suggesting an ex parte conversation by judges. Judges talk to judges. We do it. It's not an ex parte conversation. It's just saying, I've got a problem procedurally here. I'm going to hold my case. I'm going to hold my case. Mr. Rambo wanted to go to trial. He never applied in the criminal case to stay that action. He talked about how long he'd been in jail. He wanted to move forward. The criminal judge had no choice, or he would have run into speedy trial issues. Mr. Rambo, we still don't even know what Mr. Rambo's position was on this day in the Chancery court case, because there's no paperwork. We weren't a party to that. We got as much of the records as we could. But there is no paperwork indicating what his position was. The decision on stay doesn't indicate what his position was. As to what? As to the stay. Because, remember, he had the Fifth Amendment right against self-incrimination, which, while his criminal case is pending, he could have easily said, I'm not testifying. I'm not doing a hearing. And the slander statute itself gave the court the right to either rely on the judgment of conviction or do a hearing. And it's common practice for civil cases to wait to the outcome of a criminal trial. I think that's what should have happened here. I'd say that happens a lot, especially when you have a case like this. In this context, where the rights and the criminal contracts may be impacted by the stay imposed in the civil trial? Yes. Everybody's saying, you know, everybody should have done something. But what about petitioner's obligation to do anything? We don't know what his position was on the stay. He didn't appeal the stay. He didn't ask the criminal court to hold up the criminal case while he was dealing with the Chancery Court action. And we need an opportunity many times over at the Chancery Court to get counsel. Can you appeal a stay? Yes, you could appeal a stay. That's a final order in jury? It's not a final order. It's interlocutory. But it's appealable if someone is properly granted and you can make out irreparable harm to the appellate division. And although, you know, it is interlocutory, appellate division in New Jersey will take issues of constitutional importance. So then if that had constitutional import, maybe that's the answer to Deirdre Seppler's question. You could, in the civil contracts, violate someone's constitutional rights. Well, I think we already agreed on that. But I said it doesn't. Well, we agreed, too. But it doesn't change the fact that there was nothing in the criminal case. There were no court orders issued in the criminal case was impinged upon his choice of counsel. Zero. And the prosecution in the criminal case did nothing to impinge upon his choice of counsel. Well, he couldn't get the counsel that he wanted necessarily because the $290,000 that two years after this all happened was unfrozen then became available. But if it was available in 08, what would he have done? He probably would have gotten his own counsel, right? I don't think, and I think I footnoted this in my brief, I don't think there was $290,000 of liquid assets available. Even by the Chancery Court's decision, if you look at the transcript, first of all, it was an uncontested hearing because by that point the state had the $6 million judgment. So they didn't choose to spend any more expenses related to a contested hearing. But when you look at the transcript from the Chancery Court decision, she's going off the list that was provided by the petitioner. And it's like towels and the Black & Decker leaf blower and other items like that that are not easily liquidated. And the real value upon liquidation is clearly unknown. The one liquid asset in the estate was a bank account that had a little over $80,000 in it, $40,000 of which was used very early on. How is that titled, that bank account? It's a joint bank account. That was, $40,000 was quickly used to pay to maintain some of the properties involved in the estate. That left $40,000 divided by two. But ultimately, on a look back, we can safely say that the decision of the court in 2010 means bringing up money to him that those monies were not connected to the crime. Is that correct? I wouldn't categorize them as being connected or not connected. They were the distribution of the marital assets. So that would, in effect, be a decision. I mean, the implication of that is they were not connected to the crime. Because if they were connected to the crime, that decision wouldn't have come out, would it? What decision? I'm sorry. The decision in 2010 to giving him access to $290,000 worth of property. Correct, Your Honor. But, again, the real liquid value of that asset was somewhere closer to $40,000. I'm talking about the value, $290,000 worth of value. Correct. Okay, so that, in effect, on a look back, we can now safely say that $290,000 in value was not connected to the crime. I would disagree that we know the true value because it was in the hearing, but we have to use that number. $290,000 or $29, it was not connected to the crime. But under New Jersey law, because he intentionally killed his wife, that money was for the benefit of the beneficiaries of her estate. That was what I thought when we just got through that. The question is, did Ambrose just ask you? You're putting the Slavers Act back into it. But the question was asked to try to get to the value of the assets that were divorced from being subject to the Slavers Act. That is individually owned. And I know you and others want to take this and break it down, but it's just not that dividable. All these issues are intertwined. I give up. Why don't we hear from Mr. Coughlin? Can I just make one final note? There is an issue, too, with what the district court said in its last footnote on this case. It basically provided no remedy for how this could be corrected upon retrial. I'm going to ask Mr. Coughlin about that. That's the concern I have. Thank you. Thank you. Good morning, Your Honors. May it please the Court. Richard Coughlin on behalf of Roy Rambo. I don't think I've ever seen you before, Mr. Coughlin. I think you're used to coming in, don't you? Certainly not from that table. What about the remedy? How in the heck can we remedy this? We can't because if it goes back, it's not going to have money for counsel. Well, I've thought about that. And I think that, frankly, the state court ought to have the first shot at deciding that. And I say that because it seems to me there's a couple of issues that might impact on whether there's a remedy. The easy answer would be to say the state violated his constitutional right to counsel of choice. He had asked for a minimum of $200,000 to be used to retain counsel and retain experts, a discreet amount. That amount should be provided to him for his defense by the state. And I hesitate to say that because although it doesn't affect the right that was implicated, there may be some reasons to mitigate the state's responsibility for the amount that they would have to put forward to make Mr. Rambo whole. And I say that because maybe there were things he could have done to preserve his assets. He had preserved his right, but maybe he didn't take the steps that he should have taken to preserve his interest in those assets so that when his day came, he would have that money available. Well, he didn't follow through with the appeal. He didn't. So, well, maybe when he, after the final dispute... He couldn't get a transcript and therefore he didn't pursue the appeal and was dismissed. Right. And then in 2009, when he tried to reinstate the appeal, there was a back and forth between him and the appellate division where they asked him to explain how it is that his constitutional rights were affected by the decisions in the Chancery Court and how it was that he was going to be able to provide them with sufficient record without the transcripts. And he provided that information and the response he got was, oh, this is an interlocutory appeal. You can appeal it when there's a final disposition. There's a final disposition in 2010. He does appeal it. Now, he appealed based on the violation of his constitutional rights and the application of the Slayer Statute. But I don't believe that his appeal, at least as I read the opinion, preserved the 2013 appellate division, In Re State, where he preserved his interest at that point in the state assets sufficiently to protect himself. Now, I should also say that the state faults Mr. Rambo for a number of things, including failures to take interlocutory appeals. And I think the record in this case shows that that would have been futile. But more importantly, it was during that period that he's faulted for not taking these interlocutory, or trying to get the interlocutory appeals, that he is appealing his conviction. And in the context of that appeal, he's raising the constitutional rights that were violated by the Chancery Division decisions. And in that context, he asked the court to expand the record or to take judicial notice of the Chancery Division proceedings. And at that point, the state, if they've got an interest in the finality of the judgment, the state could have weighed in on that. They could have asked the court to take judicial notice and consider those issues and get a resolution of this. In 2006, when it went up on appeal, or 2008, when he petitioned for certification to the New Jersey Supreme Court. And they didn't. They sat up their hands. And so is that state action? Is that prosecutor involvement in this? I'd also say that when Judge Shipp, in terms of what the law was in 2002, 2003, 2008, Judge Shipp applied the law that existed in 2002. And he applied the law that the attorneys for the estate told the court when they asked for a TRO on August 23, 2002, what they told the court the law was. Wait, Shipp wasn't involved then, was he? No, he wasn't. But when the state lawyers asked for the TRO and asked to restrain all of Mr. Rambo's assets, no matter where he came from and no matter how much money he had. But the question we have is, back when all this happened, how can a Chancery Division, which is a civil court, freeze assets and thereby collaterally violate the Sixth Amendment by depriving you of the opportunity to hire counsel? Well... I mean, that's... No, I understand that. I mean, for habeas you have to show that there's clearly established federal law. And that's the big hill you've got to climb. I understand. And let me just quote from page 629 of the appendix, which is the estate's lawyers' moving papers, where they say that the granted preliminary relief will not result in greater harm to Roy L. Rambo. If the court freezes all property owned by Roy L. Rambo and decedents of state, Roy L. Rambo will not suffer greater harm than plaintiffs will incur if such relief is not granted. As a resident of Warren County Prison, Roy L. Rambo has little use for money or other property other than to pay for a reasonable legal defense. Roy can easily make an application to the court for such expenses. In the end, after a determination is made regarding which property should be designated as marital property, he can access an equitable share of the marital property and no harm will have resulted. That was the law in 2002 that they accurately relied on and that they relied on to get the injunction. And when then, after the fact, when Mr. Rambo did exactly what they told him he should do, and what the law division judge told him was appropriate, the Chancery Court, a year later, said no, you can't have the money. And under Kaplan, the rationale in Kaplan starts from the proposition that there is a category of assets called tainted assets. And there's a long history of Supreme Court decisions dealing with tainted assets in other circumstances. And it has a meaning. And the meaning is that it's traceable and related to the criminal activity. And the court said that because you've got a diminished interest in those assets, because they're tainted, the burden on your Sixth Amendment right to use those assets to hire counsel of choice is permissible. Because, A, you've got a limited interest in those assets. And, B, the government's interest in those assets is substantial. Well, beyond that, I thought you were saying that upon commission of the crimes specified in the Forfeiture Statute title transfer. Transferred. You don't have a legitimate property interest in those assets. And more to the point, the court said this isn't an absolute bar on using assets to hire counsel. If you've got assets that are not tainted, that are not in that category, you're free to use them. And you're free to hire whoever you can if you've got those assets. The way that the New Jersey courts applied this Slayer statute in this case, which at least fundamentally odds with how it's supposed to work, and I know that's not the issue, but the way they did it, it is a global freeze on all of somebody's assets. Why should he have taken the appeal and perfected the appeal by following up? He didn't have the transfer, but it was a legal argument. Why should he not have been charged with appealing that order? Ultimately, he did in 2010. Because when he tried to take an interlocutory appeals in the middle, he was told he couldn't. And he thought that he was perfecting that appeal through his appeal of the criminal conviction, which didn't become violent until 2008. Violations already occurred at that point. Well, that's correct. But he also tried in 2007. He renewed his application to the Chancery Division for funds to hire a lawyer while he was pending appeal. And again, it was denied. Again, back to the big problem we have. You know, Luis made it clear that Kaplan and Monsanto, quote, had no occasion to opine about the constitutionality of pretrial restraints of other untainted assets, close quote. Okay. And I would say that's in the context of tainted assets as understood under the forfeiture statute where substitute assets. But let's assume here they're untainted. But at that time when this happened, in this case pre-Luis, is there any Supreme Court decision that tells you what you can do with regard or cannot do with regard to untainted assets? I think Kaplan says that with regard to untainted assets. Luis sets a new constitutional rule. And it said that Kaplan and Monsanto had no occasion to opine on what to do with pretrial restraints of untainted assets. So it appears that there was no clearly established federal constitutional law prior to Luis. I'm just trying to get – how do I get over that hurdle? Well, I think the way to get over that hurdle is to understand the use of the term tainted assets. Well, tainted assets, we know what they are. They're connected to the crime. Right. In the context of the federal forfeiture statute, which has three parts, and parts one and two were at issue in Kaplan and Monsanto. It's the third part of that statute, the substitute assets issue. So there's probable cause to believe that when Luis' $48 million was defrauded, all of that money is gone. But there's $2 million that came from legitimate sources that the government wants to say, well, we're going to get that too. Because that's substitute assets. Is there any appellate federal circuit court decision that says that a civil court cannot or violates a criminal defendant's constitutional rights by withholding untainted assets? I was not able to find anything on that issue. And there could be a lot of reasons for that. It could be because most courts do exactly what Mr. Rambo asked be done and what the law division judge expected, which is they allow a reasonable access to the assets. And along those same lines, the slave statute codifies New Jersey common law. No change. 1977, there's a New Jersey appellate division case, which is the only New Jersey appellate division case that analyzes the Sixth Amendment in the context of freezing assets and whether or not they're available. And the court said plainly, yes, the Constitution says they're available. So that's New Jersey law, which because there was no... So you're saying there are New Jersey cases that hold that a state civil court can violate a criminal defendant's constitutional rights to counsel by withholding assets. Yes. And what's the name of the case? Jacobson v. Jacobson. And what exactly does it say? It says that you have a Sixth Amendment right under the common law, New Jersey common law application of the slave rules, to access the money for use in your defense. Does that to deference apply? I don't believe it does. There's never a decision on merits. No court here ever weighed Mr. Granlo's Sixth Amendment interest, what that Sixth Amendment interest is, the right to choice of counsel, and weighed that against what the interest of the estate is in access to sell more money. It's a truism. The right to counsel of choice is not absolute. But then it conflates that with the fact that he's had counsel appointed. So they said, well, there's no appreciation that these are two distinct rights under the Sixth Amendment. So they use the appointment of counsel as an excuse to not address the counsel of choice issue. So let me get back to, and this is far from a case that would suggest that it is moot. But if mootness is, one of the problems of establishing mootness is a case where you are unable to remedy the situation, the evil confronted by judicial order. I know what you said earlier, let's let the state court worry about that. I've never seen mootness in that context. But isn't there a kind of something like mootness percolating here because we can't remedy it? He has no way of now providing for his own counsel. Well, at a minimum, I would say have an opportunity to go back to square one. And there was a plea offer that was made. That should be re-extended. We knew we were going to do that. Well, he has to go back to square one. If it's the status quo at the time of his arrest, I think that's an appropriate consideration. As you know, as well as me, our behavior is the conditional risk. We simply send him back in order that he be retrieved within a certain number of days or that he be released. Well, we can't do anything further than basically tell the government. It's because it's not even on the record before where these talks were. As soon as they were, we can't get into that. The remedy then, you know, Judge Kaplan and Stein went through a number of fact hearings to determine where the fault lay and the KPMG situation where the prosecution had convinced the corporation that it would be in their best interest to not fund their employees' defense. And ultimately, KPMG wouldn't come up with the money and the court dismissed the charges. Now, you know, I understand that's an extreme remedy. But, you know, you've got a situation where a, you know, if you apply, if you accept the state's rationale, then anybody, any case where there's a victim of a crime, the state can enact a statute that allows the victim to tie up the assets of the accused regardless of how much money they've got, where those assets are, and basically impose a forfeiture, a criminal penalty on somebody who's presumed innocent. So you say that the case that supports you is Jacobson. Do you have a copy of Jacobson in front of you? I've got one here. So Jacobson will be interpreting the New Jersey Constitution? New Jersey Constitution and the Sixth Amendment. And what's the size? It is, the size is 376 A2nd 558. Okay, so that's an early goody. Exactly, yes, and it predates the statute, the slayer, the enactment of the statute, which the courts all say. And what's the language in Jacobson? What exactly does it say? Okay. It is not disputed that both the federal and state constitutions grant the accused the right to have assistance of counsel for his defense. Included in the scope of the constitutional right is the right of the accused to secure counsel of his own choice. A review of the record clearly demonstrates the defendant is not going to judge, and therefore there are insufficient funds from the sale of the farm to pay the retainer, which the defendant agreed to pay to his attorneys in connection with his defense of the criminal charges against him. So where does that say that a defendant's, the civil court, collaterally violates a right to counsel by restraining assets in a criminal trial? He, as it happens, this was an appeal from a chancellor division decision, which was to preclude him from using that money. I just typed in that site. I got a case called Widmer v. Councilman 376A2nd558. By 5A, I was writing in. 376A2nd558. I have the New Jersey Super site as well. Oh, no, there it is. Okay. I've got it. I'm looking at pages 67 and 68. Well, I'm sorry. So it's the next second. Oh, I'm sorry. I'm sorry. Yeah, yeah. I'm looking at the 560 something. It is, no, I'm sorry. 561 is the A2nd page. Okay. Let me look at the exact language it says. So it is beyond dispute that both the federal and state constitutions grant and accuse the right to have assistance of counsel for his defense, including the scope of this constitutional right is the right to be accused to secure counsel of his own choice. The cases are cited. Our review of the record clearly demonstrates the defendant is not indigent and that there are sufficient funds from the sale of his pharmacy to pay the retainer, which the defendant agreed to pay to his attorneys in connection with the defense of the criminal charges against him. Okay. So that says it sounds like he has the assets to pay. But I'm trying to find a case. Does this case, it doesn't sound like it's on all four. The chancery court has said he couldn't use them all. They weren't going to free the money up. And the appellate court said that if they say some general principles, I got it. But in this case, they're saying he actually did have the money, correct? Right, because there were assets there that were going to be sold, and the chancery division had said you can't use it because you've got to wait until after there's a disposition. And the Jacobson court said no. It sounds like the appellate court took a different path. It's also a very, very brief procuration. It's basically a two-page mess. I think it reflects the reality that this is an outlier situation. I'm not saying that there aren't a whole lot of empathy for the position, but I'm trying to find something anywhere. As you and I both said, we couldn't find anything, certainly not on the federal level, that supports the position that you're taking, that there was somehow at the time of this case clearly established federal law. Well, I have to go back to Kaplan and say that Kaplan is setting the boundaries. Before Kaplan, their expectation was that anything you can get your hands on, basically, you can use to hire counsel. If the Supreme Court says what it said in Luis, that Kaplan and Monsanto did not deal with the use of untainted assets, who am I to tell the Supreme Court that, in fact, you really did do that in Kaplan and Monsanto? Well, I think Luis has to be written in context of the statute it's interpreting and the understanding of tainted assets in the context of the federal forfeiture statute. I think that's different. Sure. The basic premise here that Judge Shipp, I think, applied and understood was that a state, through a statute, through court decisions, by actions of the prosecutor, can't establish a regime where somebody cannot get access to money that they've lawfully acquired. So this was done by actions of the prosecutor. No, no, no, I understand. I mean, I think there are things the prosecutor could have done and things that the trial court could have done, but, you know, they didn't. So the idea that somehow his hands were tied, I mean, otherwise you set up a situation where you allow a constitutional right to be decommissioned through some backdoor mechanism. And by allowing a court to freeze all of somebody's assets, that makes this a public defender act, appointed counsel act, for a discrete class of accused individuals. And there's no justification for that under the Constitution. Did the criminal judge have the authority to unfreeze assets or to bring assets over from the civil side? I would argue that he did. I would argue that the state had no hesitation communicating with the criminal trial judge and telling him that we're not giving them any assets after they said they were going to. But that judge basically told Rambo to go into chancery court and petition them to release assets so that you can afford your own counsel. And he did that. And he was denied. And it was back in the day in criminal court. You know, if I'm the trial judge and the prosecutor and I see what I think is a pretty obvious Sixth Amendment violation that is being baked into this prosecution, you know, I would bring the state in. I would go or I'd write a letter to the chancery division. The trial judge said as much. He said this is going to come back here. Yes. And, you know, for the reasons I've indicated in my briefing today, I think Judge Shipp got it right. And I know that a difficult, convoluted course, you know, and there were steps along the way where it could have been remedied and made more simple. All right. Thank you. Thank you. Your Honor, I'd like to talk a minute about when he did ask for the release of marital assets in the criminal case. He was talking about property, the marital property, that was specifically covered by the Slayer Statute. Because under New Jersey's Slayer Statute, if you intentionally kill your spouse, the joint, anything held by joint tenancies by the entirety, like the property that he was seeking the release of, does not pass to the killer's estate. You don't understand that. Right. So he was seeking assets that weren't directly covered by the Slayer Statute. Those marital assets were covered by the Slayer Statute. And I think this court has to accept the decision of the appellate division affirming what occurred in the estate case. They said everything that occurred in that case was proper, and they affirmed that decision. And I think this court is bound to follow that. I don't think you can say they wrongfully decided it. It was New Jersey law. They interpreted New Jersey law. They're the appellate division. And the question I've asked you previously is, let's say Luis predated what occurred here. So Luis occurred before 2008. Right. Okay. Would there be a constitutional problem? I say no. Because what the defense counsel said when he sat down is actions of the prosecutor. There were no actions of the prosecutor in this case. And Lott and Johnson. Luis isn't necessarily limited to a prosecutor, is he? I believe it is. And I believe the cases like Lott and Johnson that have interpreted Luis talk about the prosecutor. It was the prosecutor's actions inside the context of the criminal case. And all those cases have been brought to the language of Luis doesn't say prosecutor. It says the government. And I think that they were referring to the government who saw the whole picture, which was the prosecutor. What's the remedy? Assuming, hypothetically, this goes back, is there a remedy? Is there a remedy? The remedy is he would have a public defender, but he's going to say that's not good enough. And here's the issue. And here is another reason Luis and Kaplan and Montesanto are distinguishable. In those cases, in Luis specifically, when they found a violation of the Sixth Amendment because of the prosecutor's actions, the remedy was easy. The prosecutor had the money. The prosecutor returns the money. In this case, the Warren County Prosecutor's Office doesn't have his money. We never have his money. We never attempted to get his money. So there's no way we can return what we don't have. And I think that shows how it is materially distinguishable because we did nothing to infringe upon his rights. And, in fact, the trial court, although it made comments of its personal opinion, it told him, go to the Chancery Court. And when he was denied, the judge, and I said it in a footnote in my brief, said, file an appeal. And he didn't. The only thing he appealed in 2005 was the transfer of the title of the deed to one of the properties. That's the only thing he appealed. He admitted that in his certification. He didn't appeal the fact that he wasn't given money for his criminal defense. He never appealed that until well after the criminal conviction became final. To deny the state a way to prosecute someone accused for the intentional killing of his wife just doesn't make sense in the context of this case. We did nothing wrong. The trial court in the criminal case did nothing wrong. What about the civil court? What about the civil court? I think they were correct under New Jersey law. That's what our appellate division said. And our Supreme Court refused to serve. And I don't think that issue can be revisited. What's your view of the Jacobson case? The Jacobson case predated the Slater statute. It was distinguished, and that's why it wasn't filed in those cases. And it is not nearly as specific as defense counsel. What's the relevance of the Slater statute? Just codify common law. Every state has a Slater Act or something very much like it, either codified or the common law. That's an ancient concept. Correct. But not the way this one works. It does something with tenancies of identity, how they're transferred, and it allows for constructive trust until the outcome of the criminal case is known. I mean, the statute specifically allowed for that. You can prove your case by a judgment and conviction. You can prove your case. There's nothing new there. That's ancient, really ancient law. Right, which is why it's distinguishable from these. Why wouldn't Jacobson still be helpful? Because it said Jacobson wasn't right under the Slater statute. It talked about the property issue there. Okay. And, again, there was he only wanted the property that was jointly owned. And I don't think it fits into any package of tainted or untainted. I know the court would like it to. But it's marital properties inexplicably intertwined. And had he not been convicted, he would have gotten it. What does the Supreme Court say is the definition of tainted? Tainted is in context of a government forfeiture. Under the statute, it was traceable to the crime. Correct. But in this case, it's different, okay, because we're not talking about a government forfeiture statute. But is this marital property traceable to the crime? No, it's not traceable to the crime. But he shouldn't benefit from this crime either. And that's what the Supreme Court of Vermont said a lot. And that could put your honorees in a bad position. Well, that's the purpose of the Slater statute. They have a similar statute. No, I'm saying that's the purpose of the Slater statute. You don't benefit from your crime. Right, and that's what happened here. And why shouldn't he benefit from intentionally killing his wife and shooting her in the back when all she had in her hands was a Tupperware? Well, don't go in a circle. What we're trying to get at is whether or not there are funds available that were not. And we say were not available. If I could just finish for a second. I know it's tough here, but we're almost done. So let me just leave a little bit of dignity. Let me get one question out. And I forgot what the question was. But basically what we're trying to get to is if there are funds that are there that are his funds. And they're not tied to the crime. And these funds are not tied to the crime. Then the Slater Act does not reach those funds. No, the Slater Act places a constructive trust upon those funds, and they're not available to him. The court did that. You're saying the Slater Act places a constructive trust upon independently owned funds, not traceable to any kind of vested interest. Correct. It allowed the funds, the estate, and the marital assets to be placed in a constructive trust. For what purpose? For what purpose? To see whether he was going to get them if he was found not guilty. Well, that's the same thing. You're saying it's put in a constructive trust to see whether or not he has an ownership and trust in the funds. That's what you're saying. To see. But he did have an ownership interest in that. It had to be determined at a later time. Because the estate also had... Okay. Thank you. Thank you. This court stands adjourned until Wednesday, March 23rd at 9 a.m.